NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-1085-14T1

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

ANTHONY F. NOVELLINO,

 Defendant-Appellant.
_____________________________

 Submitted February 28, 2017 – Decided August 10, 2017

 Before Judges Fisher and Vernoia.

 On appeal from the Superior Court of New
 Jersey, Law Division, Morris County,
 Indictment No. 11-02-0199.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Jay L. Wilensky, Assistant
 Deputy Public Defender, of counsel and on the
 brief).

 Fredric M. Knapp, Morris County Prosecutor,
 attorney for respondent (Erin Smith Wisloff,
 Supervising Assistant Prosecutor and Paula C.
 Jordao, Assistant Prosecutor, on the brief).

PER CURIAM
 Judith Novellino1 was murdered on June 19, 2010. She had been

stabbed eighty-four times and a pig mask covered her face. A jury

convicted her former husband, defendant Anthony Novellino, of

first-degree murder and other offenses. Finding no merit in

defendant's arguments, which include challenges to the admission

of evidence regarding the pig mask and the denial of a suppression

motion, we affirm.

 Defendant was charged in an indictment with knowing or

purposeful murder, N.J.S.A. 2C:11-3(a)(1) and (2), third-degree

possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-

4(d); fourth-degree unlawful possession of a weapon, N.J.S.A.

2C:39-5(d); hindering apprehension, N.J.S.A. 2C:29-3(b)(1); and

tampering with physical evidence, N.J.S.A. 2C:28-6(1).

 Prior to trial, Judge Robert J. Gilson conducted an

evidentiary hearing on defendant's motion to suppress statements

he made on four separate occasions after he was taken into custody.

The judge issued an order and a detailed written decision granting

the motion in part and denying it in part. The matter then

proceeded to trial.

1
 Because defendant and the victim share a surname, for ease of
reference we refer to the victim by her first name. We intend no
disrespect in doing so.

 2 A-1085-14T1
 The trial evidence showed that on June 8, 2010, defendant and

Judith were divorced following a thirty-seven year marriage. Under

their divorce property settlement agreement, defendant retained

the marital residence but was required to pay Judith $110,000

within sixty days for her interest in the home. Judith was required

to remove her property from the home by June 22, 2010. She retained

all of the couples' collectible figurines except one, a figurine

of a pig, which defendant retained.

 Eleven days later, on June 19, 2010, defendant and Judith's

daughter, Christina, went to the former marital home. Christina

walked upstairs to the bathroom, where she found Judith's blood-

covered body with a pig mask draped over Judith's face. The police

were called and responded to the scene.

 The police attempted to contact defendant at his place of

employment, but defendant had not shown up for his scheduled shift

that day or the day before. The police also searched the house and

found a large wood-handled knife and a smaller knife in an alcove

on the first floor of the home.

 The police obtained information from defendant's email

account showing communications with a woman in Puyallup,

Washington. They contacted the woman, confirmed she had been in

contact with defendant, and on June 24, 2010, located defendant

in a local Puyallup motel. Defendant was taken into custody by

 3 A-1085-14T1
U.S. Marshals on charges of terroristic threats against Judith's

divorce attorney, and was turned over to the local Puyallup Police

Department.

 Photographs taken of defendant showed a cut on the palm of

his right hand and bruising on his right hand and knuckles. A

letter defendant had written was retrieved from his motel room.

In part, it said, "Sorry for everything, but it was – wasn't my

fault, she jabbed me first."

 On June 28, 2010, Morris County Prosecutor's Office Detective

Steven Wilson, who had flown to Washington, transported defendant

back to New Jersey and to the Morris County Jail. On July 29,

defendant made a request in the jail to speak with Denville Police

Captain Paul Nigro.2 He also completed a written inmate request

form asking that Nigro contact him "ASAP." Wilson and Nigro met

with defendant in the jail, advised defendant of his Miranda3

rights, and recorded their conversation. Defendant discussed the

divorce and explained that on June 19, 2010, he arrived home to

find Judith's car at the house. He said he did not park his car

2
 Defendant and Nigro had a prior personal relationship. While
defendant was in the Puyallup jail, defendant asked to speak with
Nigro. On June 26, 2010, Nigro met with defendant in the Puyallup
jail and their conversation was recorded.
3
 Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d
694 (1966).

 4 A-1085-14T1
in the driveway because he was concerned a moving truck might

arrive. Instead, he parked near a neighbor's house, walked through

his backyard, and entered the rear door of the house. He heard a

toilet flush upstairs, and went upstairs where he saw Judith in

the bathroom.

 Defendant said Judith had a knife in the bathroom and

threatened him with it. He said Judith attempted to jab him with

the knife, a struggle ensued, and he cut his hand on the knife.

He recalled hitting Judith twice with the knife but denied stabbing

her eighty-four times. Defendant said everything happened in

fifteen seconds and his heart was pounding. According to defendant,

he then picked up the knife from the floor, washed his hands, and

washed the knife because it was covered in blood. Defendant denied

being angry, but admitted "what happened was wrong."

 Defendant also stated that when he left the bathroom, he saw

the messy hall closet, picked a pig mask out of it, and threw the

mask into the bathroom. He denied placing the mask on Judith's

face. He told the officers he threw the mask because "the closet

is a pigpen."

 Defendant then went downstairs and washed his hands in the

kitchen. Defendant denied planning anything and stated that when

he went downstairs he threw the knife under the stairwell.

Defendant removed his bloody shoes, put them in a bag, and later

 5 A-1085-14T1
discarded the bag at a restaurant somewhere between New Jersey and

Ohio. When he left the house, he did not know where he was going,

but eventually traveled to Washington. He said he went to

Washington to give his car to a woman's daughter and intended to

return to New Jersey to "own up to everything."

 On July 1, 2010, defendant again requested to speak with

Wilson and Nigro. They met with defendant in the jail, advised him

of his Miranda rights, and recorded their conversation with him.

Defendant admitted that in the days preceding the murder, he sent

pictures to Judith's family members showing the "smelly" and

"messy" conditions of the house due to an incontinence condition

from which she suffered. He explained, however, that he was not

"upset to the point that [he] would do something like" what was

done to Judith.

 Defendant told the officers that when he found Judith in the

house, he asked her if she needed help moving things. He said

Judith was upset and that he was nervous when he saw the knife in

the bathroom because he feared Judith intended to use it or was

carrying it for protection. He said Judith was upset that he was

in the house and picked up the knife when she saw him.

 Defendant claimed he "was in the wrong place at the wrong

time" and "was a different person" during the fifteen-second

incident. He said that when Judith pointed the knife at him, he

 6 A-1085-14T1
felt threatened. Defendant recalled struggling for the knife,

stabbing Judith twice, and feeling, "like something was

controlling him." He denied being physically capable of stabbing

Judith eighty-four times. He was afraid Judith was dead, but

nevertheless washed his hands, took the pig mask from the closet,

and threw it into the bathroom. Defendant denied placing the mask

on Judith's face. Defendant also acknowledged throwing the knife

under the stairs to hide it.

 A sheriff's officer collected evidence from the scene. He

retrieved the pig mask, which was on Judith's face, and he

testified it was oriented in alignment with Judith's facial

features. He also recovered two knives from underneath the stairs,

one covered in dust and the other without any dust. The knife that

was not covered in dust had an eight-inch blade and a wooden

handle.

 Swabs of blood were collected from various places and items

within the home. DNA testing showed that Judith's blood was found

in the sink, on the pig mask, and on the eight-inch knife blade

found under the staircase. Defendant was identified as the source

of the DNA profile from a blood swab collected near the nozzle of

the kitchen sink.

 The State presented the testimony of an expert in bloodstain

analysis, who testified that based on the blood found at the scene,

 7 A-1085-14T1
and the lack of visible blood on the mask, the mask was

"introduced" after Judith was stabbed. He also testified that the

blood patterns showed Judith had attempted to defend herself.

 The medical examiner determined that Judith suffered eighty-

four stab wounds, including: five to her face; eleven to her neck;

nineteen to her right shoulder; three to her right breast; three

to her left breast; four to her chest; thirteen to her abdomen;

fifteen to her hands; and seven to her back. The medical examiner

testified that the wood-handled knife found under the stairs was

consistent with certain of Judith's wounds that measured between

eight to ten inches in depth.

 The wounds resulted in numerous internal injuries, including

the perforation of the small intestine and diaphragm, and a

puncture to the right lobe of the right lung. The medical examiner

opined that the cause of death was multiple sharp force injuries

and the manner of death was homicide.

 Defendant's neighbors testified that defendant expressed

anger about Judith coming to the house and removing items when he

was not present. He also complained about the messiness of their

house, and the condition of their furniture due to Judith's

incontinence condition. Defendant showed the neighbors pictures

of furniture that he said Judith stained and referred to Judith

as a "pig." Defendant told a neighbor that he intended to show

 8 A-1085-14T1
photographs of the stained furniture in court during the divorce

proceeding to humiliate Judith. He also asked neighbors to

telephone him if they saw Judith entering the home when he was not

present.

 Defendant told a neighbor he was upset about the divorce, he

would not go "down without a fight . . . [and he] would get the

last laugh." Four days before Judith's murder, defendant brought

the neighbor a plant and said, "Here, I was going to put it on

Judy's grave, but it was too pretty."

 The jury found defendant guilty of all of the charges.

Defendant was sentenced to a fifty-year custodial term on the

murder charge, subject to the requirements of the No Early Release

Act (NERA), N.J.S.A. 2C:43-7.2. Following an appropriate merger,

the judge imposed concurrent three-year prison terms on the other

offenses.

 On appeal, defendant makes the following arguments:

 POINT I

 THE TRIAL COURT ERRED PREJUDICIALLY IN DENYING
 DEFENDANT'S MOTION TO EXCLUDE EVIDENCE OF A
 MASK ON THE VICTIM'S FACE.

 POINT II

 [] DEFENDANT WAS GREATLY PREJUDICED BY THE
 JURY'S HEARING OF HIGHLY INCRIMINATING
 STATEMENTS MADE BY QUESTIONERS DURING HIS
 RECORDED STATEMENT. (Not Raised Below).

 9 A-1085-14T1
 POINT III

 [] DEFENDANT'S STATEMENTS WERE NOT MADE
 KNOWINGLY AND VOLUNTARILY, AND WERE TAKEN IN
 VIOLATION OF HIS ASSERTION OF THE RIGHT TO
 COUNSEL, NECESSITATING SUPPRESSION. [U.S.
 Const. amends. V, VI, XIV; N.J. Const. art.
 I, ¶¶ 1, 9, 10].

 POINT IV

 [] DEFENDANT RECEIVED AN EXCESSIVE SENTENCE,
 NECESSITATING REDUCTION.

 I.

 We first turn our attention to defendant's contention the

court erred by denying his motion to exclude evidence that the

victim was found with a pig mask placed over her face. Defendant

claims the evidence should have been excluded under N.J.R.E. 401

and 403, and as other bad acts evidence under N.J.R.E. 404(b). We

are not persuaded.

 "A trial court's ruling on the admissibility of evidence is

reviewed on appeal for abuse of discretion." State v. Rose, 206

N.J. 141, 157 (2011); State v. Hess, 207 N.J. 123, 182 (2011).

Under this standard, the trial court's decision to allow evidence

should not be overturned "unless it can be shown that the trial

court palpably abused its discretion, that is, that its finding

was so wide [of] the mark that a manifest denial of justice

resulted." State v. Lykes, 192 N.J. 519, 534 (2007) (alteration

in original) (quoting Verdicchio v. Ricca, 179 N.J. 1, 34 (2004)).

 10 A-1085-14T1
If the trial court does not determine the admissibility of evidence

under the correct legal standard, however, its decision is not

afforded any deference and we review the issue de novo. State v.

Reddish, 181 N.J. 553, 609 (2004).

 Judge Gilson denied the motion to exclude the evidence in a

detailed and well-reasoned oral decision, and subsequent written

order and statement of reasons. We have carefully considered

defendant's assertions, find they are without merit sufficient to

warrant discussion in a written opinion, Rule 2:11-3(e)(2), and

affirm the court's order denying defendant's motion substantially

for the reasons set forth in Judge Gilson's oral and written

decisions.

 We add only the following brief comments. Defendant's

arguments rest on the contention that the mask had little probative

value and substantial prejudicial effect, and thus should have

been excluded under N.J.R.E. 401 and 403, and under N.J.R.E. 404(b)

based on an application of the State v. Cofield, 127 N.J. 328

(1992) standard. As the trial court correctly determined, however,

the evidence was highly probative because it showed that prior to

Judith's murder defendant expressed anger about her perceived

messiness in the house, that he referred to her as a "pig," and

that he admitted to police that after stabbing Judith, he threw

the pig mask at her. Defendant also retained only one figurine in

 11 A-1085-14T1
the divorce property settlement agreement reached eleven days

before Judith's death – a figurine of a pig.

 Contrary to defendant's assertions, evidence of the mask

inferentially established defendant's identity as the murderer,

corroborated defendant's admissions that he stabbed Judith, and

supported the credibility of his statements to the police. It also

provided proof of defendant's motive, intent, and state of mind

for the stabbing, and supported the State's theory that defendant

knowingly and purposely killed Judith in part because of his anger

about her messiness in the household. Further, evidence concerning

the mask undermined defendant's theories that he acted in self-

defense or by passion or provocation. We are therefore convinced

that the premise for defendant's various arguments that the court

erred in admitting the evidence – that the mask had little

probative value – is wholly contradicted by the record.

 II.

 For the first time on appeal, defendant argues that his

recorded statements that were played for the jury were unduly

prejudicial. Defendant contends the recordings included questions

and statements by Nigro and Wilson that characterized the evidence

and defendant's conduct, or constituted statements of unproven

fact. Defendant asserts the court erred in admitting the recordings

 12 A-1085-14T1
because the officers' questions and statements "essentially argued

the State's case."

 We first note that trial counsel did not object to the

introduction of the recordings based on any claim the officers'

questions and statements were prejudicial or improper. We

therefore review for plain error, and "disregard any alleged error

'unless it is of such a nature as to have been clearly capable of

producing an unjust result.'" State v. Funderburg, 225 N.J. 66,

79 (2016) (quoting R. 2:10-2). We find no plain error here.

 The recordings that were played for the jury were redacted

to delete any statements by the officers and defendant that were

unrelated to the commission of the crimes charged in the indictment

or otherwise unduly prejudicial to defendant. Counsel reviewed and

agreed to the redacted versions. There was no request to redact

the officers' questions and statements defendant now claims were

prejudicial, and there was no objection to the admission of the

recordings into evidence. We may presume based upon trial counsel's

failure to object that the officers' statements and questions were

not considered by defendant to be prejudicial. See, e.g., State

v. McGraw, 129 N.J. 68, 80 (1992) (finding that defendant's failure

to object to a jury charge "gives rise to a presumption that he

did not view its absence as prejudicial to his client's case").

 13 A-1085-14T1
 Moreover, the court ensured that defendant would not suffer

any prejudice as a result of any of the officers' statements or

questions. After playing the July 29 interrogation recording, the

court gave the following limiting instruction:

 [D]uring the playing of the interview from
 June 29, 2010, . . . and in the upcoming video
 that you're about to see concerning his
 interview on July 1st, 2010, you are going to
 hear, and you probably already heard some
 statements by the detectives and law
 enforcement personnel that interviewed him
 that include comments or opinions related to
 the credibility of the [d]efendant, and what
 may or may not have happened. You are not to
 give those comments any weight. Determining
 the credibility of defendant's statement and
 what weight to give to it is for you and you
 alone to determine. Similarly, you are to
 determine the facts. As I have instructed you,
 you are the sole judges of the facts.

Likewise, after the July 1, 2010 interrogation recording was

played, the court repeated the limiting instruction. In the court's

final instructions to the jury, it reminded the jury that where

it "gave a limiting instruction as to how to use certain evidence,

that evidence must be considered . . . for that purpose only."

 Defendant does not challenge the substance of the limiting

instructions and acknowledges they were "accurate." Nevertheless,

he claims it was "impossible" for the jury to heed the judge's

instruction and, as a result, he suffered "severe prejudice." We

disagree. We presume that the jury followed the court's

 14 A-1085-14T1
instructions, State v. Smith, 212 N.J. 365, 409 (2012), and the

jury therefore did not give "any weight" to the "comments or

opinions" expressed by the officers during the interrogation.

There is no basis in the record to support a contrary conclusion.

Thus, despite defendant's contention, he cannot demonstrate that

the officers' statements about which he now complains caused him

any prejudice.

 Defendant relies on our decision in State v. Laboy, 270 N.J.

Super. 296, 302-09 (App. Div. 1994), where we held that it was

reversible error to permit an officer to testify about a non-

testifying co-defendant's statement implicating the defendant. We

rejected the State's contention the statement was admissible

because it showed what prompted the defendant to confess and

reasoned that the defendant's confrontation rights as defined in

Bruton v. United States, 391 U.S. 123, 126, 88 S. Ct. 1620, 1622,

20 L. Ed. 2d 476, 479 (1968), are violated when a co-defendant's

confession implicating the defendant is admitted without an

opportunity to question the co-defendant. Id. at 305. Here,

admission of the officers' statements and questions during the

interrogation do not implicate his confrontation rights under

Bruton and, therefore, our holding in Laboy is inapposite.

 We are also convinced that even assuming the statements of

the officers were admitted in error, they were not clearly capable

 15 A-1085-14T1
of producing an unjust result. R. 2:10-2. Again, we are convinced

the evidence against defendant was overwhelming. See Sowell,

supra, 213 N.J. at 107-08; Nero, supra, 195 N.J. at 407. And, even

if all of the officers' questions and statements and defendant's

responses were redacted from the recordings, defendant's remaining

responses included numerous and detailed admissions that he

stabbed Judith, threw a pig mask on her face, hid the knife,

discarded his shoes covered with Judith's blood, and fled. Thus,

any alleged error in failing to sua sponte redact the recordings

to eliminate the officers' statements and questions was not clearly

capable of producing an unjust result.

 III.

 Defendant also contends the court erred by denying his motion

to suppress statements he made during the June 29 and July 1,

2010, recorded police interrogations that were introduced as

evidence at trial. Defendant argues he was questioned by the police

on four occasions, that his invocations of his right to counsel

were not honored, he was deprived of a right to contact counsel,

and the officers misled him by making statements that "could be

construed as an offer of leniency in return for his confession to

 16 A-1085-14T1
the crime." Defendant therefore asserts the June 29 and July 1

statements should have been suppressed.4

 At a hearing challenging the admission of statements made

during a custodial interrogation, the "State must prove beyond a

reasonable doubt that a defendant's confession was voluntary and

was not made because defendant's will was overborne," State v.

Knight, 183 N.J. 449, 462 (2005), and "the defendant was advised

of his rights and knowingly, voluntarily and intelligently waived

them," State v. W.B., 205 N.J. 588, 602 n.3 (2011).

 When reviewing a trial court's denial of a motion to suppress

a defendant's statements, we must "engage in a 'searching and

critical' review of the record." State v. Maltese, 222 N.J. 525,

543 (2015) (quoting State v. Hreha, 217 N.J. 368, 381-82 (2014)),

cert. denied, ___ U.S. ___, 136 S. Ct. 1187, 194 L. Ed. 2d 241

(2016). We defer to findings supported by sufficient credible

evidence in the record, particularly when they are grounded in the

judge's feel of the case and ability to assess the witnesses'

demeanor and credibility. State v. Robinson, 200 N.J. 1, 15 (2009);

State v. Elders, 192 N.J. 224, 243-44 (2007). This standard of

4
 The court suppressed statements made by defendant to the police
while being transported from Washington to New Jersey. The court
denied defendant's request to suppress the recorded statements he
made to Nigro on June 26, 2010, in Washington, but none of those
statements were introduced at trial.

 17 A-1085-14T1
review applies even when the motion court's "factfindings [are]

based on video or documentary evidence," such as recordings of

custodial interrogations by the police. State v. S.S., ___ N.J.

___, ___ (2017) (slip op. at 24-25).

 We will not reverse a motion court's findings of fact based

on its review of a recording of a custodial interrogation unless

the findings are clearly erroneous or mistaken. Id. at 27. We

review issues of law de novo. Id. at 25; State v. Shaw, 213 N.J.

398, 411 (2012).

 The determination of whether the State has satisfied its

burden of proving beyond a reasonable doubt that a defendant's

statement was voluntary requires "a court to assess 'the totality

of the circumstances, including both the characteristics of the

defendant and the nature of the interrogation.'" Hreha, supra, 217

N.J. at 383 (quoting State v. Galloway, 133 N.J. 631, 654 (1993)).

The court must determine "whether, under the totality of the

circumstances, the confession is 'the product of an essentially

free and unconstrained choice by its maker' or whether 'his will

has been overborne and his capacity for self-determination

critically impaired.'" State v. Pillar, 359 N.J. Super. 249, 271

(App. Div.) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225-

26, 93 S. Ct. 2041, 2046-47, 36 L. Ed. 2d 854, 862 (1973)), certif.

denied, 177 N.J. 572 (2003). The "factors relevant to that analysis

 18 A-1085-14T1
include 'the suspect's age, education and intelligence, advice

concerning constitutional rights, length of detention, whether the

questioning was repeated and prolonged in nature, and whether

physical punishment and mental exhaustion were involved.'" Hreha,

supra, 217 N.J. at 383 (quoting Galloway, supra, 133 N.J. at 654).

The court should also consider defendant's prior encounters with

law enforcement and the period of time that elapsed between the

administration of Miranda warnings and defendant's confession.

Ibid.

 Defendant argues that the June 29 and July 1, 2010 statements

should have been suppressed because the officers failed to honor

his invocation of his right to counsel. We disagree. "Once an

accused invokes the right to counsel, that right must be

'scrupulously honored.'" State v. Chew, 150 N.J. 30, 61 (1997)

(quoting Michigan v. Mosley, 423 U.S. 96, 103, 96 S. Ct. 321, 326,

46 L. Ed. 2d 313, 321 (1975)). That "entails terminating all

questioning 'until counsel has been made available [or] unless the

accused [] initiates further communication, exchanges, or

conversations with the police.'" Ibid. (quoting Edwards v.

Arizona, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 1885, 68 L. Ed.

2d 378, 386 (1981)).

 If an accused "'initiates further communication, exchanges,

or conversations with the police,' the police officer may continue

 19 A-1085-14T1
the interrogation in the absence of counsel." State v. Melendez,

423 N.J. Super. 1, 29 (App. Div. 2011) (quoting Edwards, supra,

451 U.S. at 485, 101 S. Ct. at 1885, 68 L. Ed. 2d at 386), certif.

denied, 210 N.J. 28 (2012). "This type of waiver requires the

suspect to 'personally and specifically' initiate conversation."

Id. at 30 (quoting State v. Burris, 145 N.J. 509, 519 (1996));

see also State v. Wright, 97 N.J. 113, 122 (1984) ("An accused who

has expressed his desire to deal with the police only through his

counsel is not subject to further interrogation until counsel has

been made available, unless the accused himself initiates further

communication."). "The state must prove that the initiation

constituted a 'knowing, intelligent, and voluntary waiver beyond

a reasonable doubt.'" Ibid. (quoting Chew, supra, 150 N.J. at 61).

 The record developed on defendant's suppression motion

supports Judge Gilson's determination that defendant's invocations

of his right to counsel were scrupulously honored. Following the

June 24, 2010 arrest, a Puyallup officer advised defendant of his

Miranda rights, defendant invoked his right to counsel, and no

interrogation by the Puyallup police took place.

 Defendant subsequently initiated his June 26 conversation

with Nigro in Washington by requesting to speak with Nigro. During

the recorded conversation defendant confirmed he requested to

speak with Nigro, and Nigro again advised defendant of his Miranda

 20 A-1085-14T1
rights before the conversation continued. The conversation

immediately ended when defendant again invoked his right to

counsel.

 After being transported to New Jersey, defendant again

requested to speak with Nigro. He was given a written request form

in the jail which he completed. Based on his request, he met with

Nigro and Wilson on June 29, confirmed he requested to speak with

Nigro, and was again advised of his Miranda rights. The

interrogation then commenced and subsequently ended when defendant

invoked his right to counsel.

 A few days later, defendant requested to speak with Nigro and

again completed a written form confirming the request. On July 1,

defendant met with Nigro and Wilson, confirmed he requested to

speak with them, and was given his Miranda rights. The

interrogation that followed ended when defendant exercised his

right to not speak without counsel.

 As the court correctly determined, the evidence showed that

following defendant's initial invocation of his right to counsel

when he first spoke to the Puyallup police captain, defendant

initiated all subsequent conversations with the officers. In each

instance, the officers confirmed that defendant initiated the

communications, informed defendant of his Miranda rights, and

questioned him only until he invoked his right to counsel. There

 21 A-1085-14T1
is sufficient credible evidence in the record amply supporting the

judge's factual findings. The State therefore satisfied its burden

of proving defendant knowingly and voluntarily waived his right

to counsel during the recorded interrogations that were admitted

as evidence at trial.

 We reject defendant's contention that he was denied the

opportunity to contact an attorney. There is no evidence supporting

the contention. To the contrary, the record supports the court's

determination that the State took no action to prevent defendant

from contacting an attorney and that defendant never requested an

opportunity to contact an attorney. Moreover, the officers did not

have an obligation to contact or obtain an attorney for defendant

and, as the court found, the officers satisfied their

constitutional obligations by fully and repeatedly advising

defendant that he had a right to counsel and by honoring each of

his invocations of that right.

 We are also not persuaded by defendant's claim that the

officers enticed defendant into speaking with them by entering

into an agreement with him or by promising leniency in exchange

for his confession. The record supports the court's finding that

there was no credible evidence of any agreement between the

officers and defendant.

 22 A-1085-14T1
 Defendant also claims that his statements were involuntary

because during the June 26, 2010 conversation between Nigro and

defendant in Washington, Nigro at one point said, "Let me help

you." Defendant's assertion that the statement began a pattern of

Nigro's offering "help" to the defendant finds no support in the

evidence. Similarly, our review of the record does not reveal any

evidence supporting defendant's claim that he was offered

"leniency" in exchange for his confession.

 In sum, although defendant invoked his right to counsel at

different times, in each instance the invocation was scrupulously

honored by the officers, and questioning continued only after

defendant initiated further communications and was again fully

advised of his Miranda rights. The court therefore correctly denied

defendant's suppression motion and his June 29 and July 1, 2010

recorded statements were properly admitted.

 IV.

 Defendant argues that his aggregate fifty-year custodial

sentence subject to the requirements of NERA is excessive. More

particularly, he argues the court erred in its weighing of the

aggravating factors and mitigating factors under N.J.S.A. 2C:44-

1(a) and (b). He contends an appropriate weighing of the factors

permitted only the imposition of a thirty-year sentence with a

thirty-year period of parole ineligibility.

 23 A-1085-14T1
 We review a "trial court's 'sentencing determination under a

deferential standard of review.'" State v. Grate, 220 N.J. 317,

337 (2014) (quoting State v. Lawless, 214 N.J. 594, 606 (2013)).

We may "not substitute [our] judgment for the judgment of the

sentencing court." Lawless, supra, 214 N.J. at 606. We must affirm

a sentence if: (1) the trial court followed the sentencing

guidelines; (2) its findings of fact and application of aggravating

and mitigating factors were based on competent, credible evidence

in the record; and (3) the application of the law to the facts

does not "shock[] the judicial conscience." State v. Bolvito, 217

N.J. 221, 228 (2014) (quoting State v. Roth, 95 N.J. 334, 364-65

(1984)).

 Here, the court found aggravating factor one, N.J.S.A. 2C:44-

1(a)(1), "[t]he nature and circumstances of the offense, and the

role of the actor therein, including whether or not it was

committed in an especially heinous, cruel, or depraved manner,"

and nine, N.J.S.A. 2C:44-1(a)(9), "[t]he need for deterring the

defendant and others from violating the law." The court also found

mitigating factor seven, N.J.S.A. 2C:44-1(b)(7), the fact that

"[t]he defendant has no history of prior delinquency or criminal

activity or has led a law-abiding life for a substantial period

of time before the commission of the present offense." Defendant

does not claim there is insufficient evidence in the record

 24 A-1085-14T1
supporting the court's finding of the aggravating and mitigating

factors, but instead asserts that the court erred in weighing and

balancing them.

 Following its finding of aggravating and mitigating factors,

a court must then weigh and balance the factors in a process that

requires more than a quantitative comparison of "the number of

pertinent aggravating factors with the number of applicable

mitigating factors." State v. Fuentes, 217 N.J. 57, 72 (2014). The

sentencing court must "qualitatively assess[] and assign[] weight

in a case-specific balancing process." Id. at 72-73. "When the

aggravating and mitigating factors are identified, supported by

competent, credible evidence in the record, and properly

balanced," we will not "second-guess the sentencing court" and

must affirm the sentence provided it does not shock our judicial

conscience. State v. Case, 220 N.J. 49, 65 (2014). If the

sentencing court "forgoes a qualitative analysis" of the

aggravating and mitigating factors "or provides little 'insight

into the sentencing decision,' then" our deferential standard of

review of a sentence will not apply. Ibid.

 Applying these principles, we discern no basis to upset the

sentence imposed. Judge Gilson engaged in a qualitative assessment

of the aggravating and mitigating factors. The judge placed "heavy"

weight on aggravating factor one because the evidence showed

 25 A-1085-14T1
defendant's actions were particularly heinous, cruel and depraved.

The judge found the evidence established defendant's actions went

well beyond what was required to cause Judith's death because

defendant violently and brutally stabbed Judith eighty-four times,

including repeated stabbings after she had already fallen to the

floor. Moreover, the judge noted defendant's decision to place the

pig mask on Judith's face following the brutal assault and murder

as further evidence of his depravity.

 The judge also placed heavy weight on aggravating factor

nine. The judge reasoned there was a need for deterrence because

defendant committed a serious and brutal crime but accepted no

responsibility for it and expressed no remorse about it. Again,

the record supports the judge's finding and its weighing of the

factor.

 The judge gave mitigating factor seven limited weight under

the circumstances presented by the offense. The judge's finding

is supported by the record because, as our Supreme Court has

observed, "[t]he proper weight to be given to each [factor] is a

function of its gravity in relation to the severity of the

offense." Roth, supra, 95 N.J. at 368.

 The judge also performed the requisite balancing of the

factors, and determined the aggravating factors "substantially

preponderate[d]" over the mitigating factors. The judge's careful

 26 A-1085-14T1
and thoughtful analysis and weighing of the aggravating and

mitigating factors is supported by the record, was in accord with

the sentencing guidelines, and did not result in a sentence that

shocks our judicial conscience.

 To the extent we discern any other arguments made on

defendant's behalf, they are without merit sufficient to warrant

discussion in a written opinion. Rule 2:11-3(e)(2).

 Affirmed.

 27 A-1085-14T1